**Robert E. KEATING, Plaintiff-Appellant,**

v.

**Hon. Hugh CAREY, individually and as Governor of the State of New York; Hon. Frank J. Rogers, individually and** as Commissioner of the New York State Executive Department, Division of Criminal Justice Services; New York State Civil Service Commission; Hon. Victor S. Bahou, individually and as Commissioner, President and Head of the New York State Civil Service Commission and New York State Civil Service Department; Hon. Josephine Gambino, individually and as Commissioner of the New York State Civil Service Commission; Hon. Michael Scelsi, individually and as a Former Commissioner of the New York State Civil Service Commission; Hon. Charles Stockmeister, individually and as a Former Commissioner of the New York State Civil Service Commission; Hon. Ersa H. Poston, individually and as a Former Commissioner of the New York State Civil Service Commission; Charles D. Palmer, individually and as Assistant Commissioner of DCJS; Walter C. Slater, individually and as Administrative Officer of DCJS; Richard C. Murray, individually and as Assistant Personnel Officer of DCJS; Donald C. Johnson, individually and as Deputy Commissioner of DCJS; Robert Brady, individually, and as Personnel Officer of DCJS; Norma Sue Wolfe, individually and as Associate Public Information Officer of DCJS; Judith Hope, individually and as Appointments Secretary to the Governor, Robert Slanger, individually and as Representative of Commissioner Frank J. Rogers; John Biggins, individually and as Representative of Commissioner Frank J. Rogers; Jack Purcell, individually and as Deputy Commissioner of DCJS, Defendants-Appellees.

No. 119, Docket 82–7266.

United States Court of Appeals, Second Circuit.

Argued Sept. 22, 1982.

Decided April 18, 1983.

Meskill, Circuit Judge, concurred in part and dissented in part and filed opinion.

Robert E. Harris, Albany, N.Y., for plaintiff-appellant.

John Q. Driscoll, Asst. Atty. Gen., Albany, N.Y. (Robert Abrams, Atty. Gen. of the State of N.Y., Albany, N.Y., William J. Kogan, Asst. Sol. Gen., Albany, N.Y., of counsel), for defendants-appellees.

Before LUMBARD, MESKILL and CARDAMONE, Circuit Judges.

LUMBARD, Circuit Judge:

Invoking federal law, Robert E. Keating seeks to vindicate his constitutional rights to free speech, free association, equal protection and due process. The defendants allegedly violated these rights when they fired Keating from the State Civil Service over seven years ago. In granting summary judgment to the defendants, the district court dismissed Keating's claim under 42 U.S.C. § 1983 (Supp. IV 1980), because he had failed to bring suit within the three year limitation period provided by New York Civ.Prac.Law § 214(2) (McKinney Supp.1982). Keating had argued that the

defendants should be equitably estopped from raising the statute of limitations as a defense because they had successfully conspired to conceal his cause of action. Be that as it may, the district court held that the state courts had already determined in a suit between the same parties [1] that the plaintiff had not relied on defendants' misrepresentations concerning his rights. Thus, plaintiff was barred from relitigating an issue crucial to his equitable estoppel argument.[2] We reverse. The record shows that the plaintiff has never been accorded a full and fair opportunity to litigate the extent of his reliance on defendants misrepresentations.

Judge Miner also dismissed plaintiff's claims under 42 U.S.C. §§ 1981 (1976) and 1985 (Supp. IV 1980) for failure to allege that the defendants had acted out of a class-based discriminatory animus.[3]. We affirm the dismissal of the § 1981 claim because recovery under this section requires a showing of racial or, perhaps, quasi-racial discrimination. However, we reverse the dismissal of Keating's § 1985 claims. First, we hold that no showing of class-based discrimination is required under the first clause of § 1985(2), which makes unlawful conspiracies to deter citizens from attending federal courts. Second, we hold that Republicans are a protected class for the purpose of § 1985(3) (as would be Democrats or members of any political party, in the circumstances herein alleged), and that the plaintiff has properly pleaded that the defendants discriminated against him on the basis of his Republican affiliations.[4]

1. Defendants in the State proceedings were Frank J. Rogers, Commissioner of the Division of Criminal Justice Services, Victor S. Bahou, President, and Josephine Gambino and James T. McFarland, members of the New York State Civil Service Commission. In this action, plaintiff has sued all of the state court defendants; he has also added several new names to the list. For brevity, the opinion speaks as though the two groups of defendants were the same.

2. Thus, the court also dismissed a related claim charging the defendants with fraudulently concealing Keating's cause of action.

3. For the same reason, the district court dismissed Keating's § 1986 claim. Keating has apparently abandoned this claim on appeal.

4. Plaintiff has not separately enumerated claims under the various civil rights statutes mentioned in the complaint. Reading the complaint generously for the purposes of this appeal, we assume that the complaint sets forth causes of action under § 1985(3) and under the first clause of § 1985(2). *But see* notes 13 & 18 *infra.*

It is, as the dissent notes, always unfortunate to have to answer difficult questions of law on an inadequate record. However, our appellate

## I.

In reviewing a grant of summary judgment on statute of limitations and collateral estoppel grounds, we take as true the allegations in the complaint and the undisputed facts asserted in the affidavits submitted on the motion for summary judgment. Thus, we must assume the following facts to be capable of proof: Keating was one of nine noncompetitive employees chosen in 1966 to run the newly established Bureau of Intelligence and Identification Systems, now known as the Division of Criminal Justice Services. His twenty years of experience in journalism, particularly in law enforcement reporting, qualified him to be the Division's Associate Public Information Specialist. The Division Director, Robert Gallati, told Keating that the job came with the same rights and protections enjoyed by tenured, competitive civil servants. *See generally,* New York Civ. Serv.Law § 75 *et seq.* (McKinney 1973 and Supp.1982).

Keating performed his job excellently for several years. However, Keating claims that as an active member of the Republican Party, he was worried as the Carey administration took office and began claiming its spoils in 1975. The Democrat/Republican turnover proceeded in due course, and, in July, Keating was told that he was to be terminated because of his Republican affiliations. Deputy Commissioner Palmer also told Keating that because his position had been designated "management-confidential," he was not entitled to the protections accorded nonconfidential "tenured" employees. On September 3, 1975, Keating was fired.

Keating claims that he had always believed he was a tenured, nonconfidential employee. However, when he inquired at the personnel office, he was informed that he had never actually received tenure. There had been some technical "mistake" in the processing of his initial appointment. Other employees in his division had been granted tenure rights, but not Keating. Keating also consulted friends and associates, some of whom confirmed the "mistake" story. When he sought legal assistance from the Civil Service Employees Association, he learned only that he was not entitled to the Association's representation. In sum, Keating claims that the defendants concealed his tenured status from him, his friends, and his associates. Consequently, he then believed he had no legally enforceable right to his job.

Keating claims that in addition to concealing his tenure rights, the defendants also conspired to deter him from bringing suit in federal court. They threatened to trump up charges against him if he sought legal remedies. They promised that if he was quiet, they would find for him some equivalent position. This promise came to naught. Since 1975, Keating has been employed only intermittently.

In 1978, another victim of the Democratic purge advised Keating to see a lawyer. He did. This lawsuit followed in August 1979. At the same time, Keating filed suit in the New York Supreme Court under C.P.L.R. Article 78 to compel reinstatement based on his alleged tenure rights under New York Civ.Serv.Law § 75. The district court stayed the federal action pending the outcome of the state proceeding.

The defendants in the state action moved immediately to dismiss the complaint on the ground that Keating had failed to bring the action within the four month limitation period for Article 78 proceedings.[5] The state

---

jurisdiction is not discretionary, and we are not at liberty to ignore a proper appeal from the dismissal of several causes of action. Whether there is any merit to the plaintiff's contentions must await a trial of the issues.

**5.** C.P.L.R. § 217 (McKinney 1972). The State argued alternatively that the plaintiff was guilty of laches in waiting four years to request an Article 78 hearing. It is unclear on this

record whether plaintiff was entitled to a hearing to review his removal or to direct judicial review of the decision to fire him. Direct review must be sought within four months of the denial of a request for reinstatement. While review of a hearing must be requested within four months of the hearing, no express limit is provided for the length of time between termination and the request for a hearing. However, the New York courts have held that a plaintiff

court denied the motion without opinion. The defendants then brought an interlocutory appeal. In a five sentence opinion, the Appellate Division reversed, holding that there was "no basis" for the lower court's "finding" that Keating was excused for not bringing suit within the four month limitation period. *Keating v. Rogers,* 77 A.D.2d 694, 429 N.Y.S.2d 501 (1980). Keating's papers on appeal were "replete with statements" that immediately after being fired, he made a series of inquiries as to his rights. Thus, the court seems to have concluded, it was not the defendants' fault that the plaintiff failed to consult with a lawyer until 1978. *Id.* The Court of Appeals affirmed on the Appellate Division's opinion. 54 N.Y.2d 646, 442 N.Y.S.2d 507, 425 N.E.2d 895 (1981).

Fresh from their victory in the state courts, the defendants moved for summary judgment in the district court on the same ground, namely, that the limitation period had expired. Keating once again argued that the defendants should be equitably estopped from raising a statute of limitations defense. The district court ruled that the New York courts had found Keating's delay in filing suit inexcusable; consequently, Keating was collaterally estopped from proving that the defendant's concealment had made it impossible for a reasonably diligent person to discover his cause of action.

The district court dismissed Keating's remaining claims under 42 U.S.C. §§ 1981, 1985 and 1986 in a footnote, noting that Keating had failed to allege that the defendants acted from a class-based discriminatory motive.

## II.—*Timeliness of the § 1983 Claim*

■ We cannot agree that the New York Appellate Division determined that the entire span of plaintiff's four year delay was inexcusable. Under the equitable estoppel doctrine, a defendant's deliberate concealment tolls the statute. This effectively extends the limitation period by the length of time it would take a reasonably diligent plaintiff to discover his cause of action. In the state court, where the limitation period was four months, Keating needed to establish that, exercising reasonable diligence, he did not discover his cause of action for over three years. Here, however, where the limitation period on the federal causes of action is three years, Keating need only show that defendants' concealment excused his delay and tolled the statute for one year. This would effectively extend the statutory period to four years and render this suit timely. We conclude that no court has determined whether the defendants' concealment thwarted for at least one year Keating's effort to learn the truth. Thus, there remains at this point a disputed issue of fact which makes summary judgment inappropriate.

### A. *The Statute of Limitations*

To prevail on the statute of limitations issue, Keating need only establish that, for one year, defendants' misrepresentations caused him to delay bringing this action and thus tolled the statute for that one year.

■ The timeliness of § 1983 actions is determined by the most appropriate state statute of limitations. *Board of Regents v. Tomanio,* 446 U.S. 478, 483–85, 100 S.Ct. 1790, 1794–95, 64 L.Ed.2d 440 (1980). The most appropriate New York statute is Civ. Prac.Law § 214(2), which provides a three

who delays much longer than four months in requesting a hearing, will be held guilty of laches. *See, e.g., Community Board No. 3 v. State of New York,* 76 A.D.2d 851, 852–53, 428 N.Y.S.2d 520 (1980), *appeal dismissed,* 53 N.Y.2d 839, 444 N.Y.S.2d 58, 428 N.E.2d 390 (1981); *In the Matter of Johnson v. Director,* 52 A.D.2d 357, 361–63, 384 N.Y.S.2d 189 (1976), *aff'd,* 41 N.Y.2d 1061, 396 N.Y.S.2d 172, 364 N.E.2d 837 (1977). Thus, however the state court viewed the review proceeding, the effec-

tive limitations period was about four months. In any event, the opinion of the Appellate Division indicated Keating was guilty of laches *because* he failed to bring the action within the *four month* period provided by Article 78. Both of the cases cited by the court involved a simple application of Article 78's four month limitation. *See Solnick v. Whalen,* 49 N.Y.2d 224, 232–33, 425 N.Y.S.2d 68, 401 N.E.2d 190 (1979); *Matter of Greenbaum v. Ingraham,* 48 A.D.2d 969, 369 N.Y.S.2d 556 (1975).

year limitation period for actions to recover upon a liability created by statute. *Pauk v. Board of Trustees of the City of New York,* 654 F.2d 856, 866 (2d Cir.1981), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1631, 71 L.Ed.2d 866 (1982).

■ Although state law determines the three year period of limitation, federal law determines when the claim arises. *Pauk v. Board of Trustees, supra,* at 859; *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d ·347 (1981). Under federal law, Keating's cause of action arose when he knew or had reason to know of his injury. *Pauk, supra,* at 859. The district court held that Keating's claim arose when he learned that he would be fired, in July 1975. Thus, when plaintiff filed this suit in August 1979, he had missed the three year deadline by a little over one year.

■ Keating argues that the defendants are equitably estopped from pleading· the statute of limitations. Under federal law, when the defendant fraudulently conceals the wrong, the time does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action. *See Holmberg v. Armbrecht,* 327 U.S. 392, 396–97, 66 S.Ct.

582, 584–85, 90 L.Ed. 743 (1946); *Ohio v. Peterson,* 651 F.2d 687, 692 (10th Cir.1981); *Tomera v. Galt,* 511 F.2d 504, 509–10 (7th Cir.1975). Borrowing the State's tolling rules as well as its limitation period, *see Board of Regents v. Tomanio,* 446 U.S. 478, 484–86, 100 S.Ct. 1790, 1795–96, 64 L.Ed.2d 440 (1980), we find that the New York courts have adopted the same equitable estoppel doctrine. *See Simcuski v. Saeli,* 44 N.Y.2d 442, 406 N.Y.S.2d 259, 377 N.E.2d 173 (1978); *General Stencil v. Chiappa,* 18 N.Y.2d 125, 272 N.Y.S.2d 337, 219 N.E.2d 169 (1966).[6]

### B. *Collateral Estoppel*

The defendants argue that the New York courts have already disposed of Keating's equitable estoppel defense by determining that Keating never relied on their misrepresentations. We think defendants give the Appellate Division's opinion, set out in relevant part in the margin,[7] an overly expansive reading.

The Appellate Division noted that Keating made inquiries about his rights immediately after being fired. From this, the court apparently concluded that Keating's *three-year delay* in consulting with an attorney was not the fault of the defendants and that there was no basis for finding that

---

**6.** *See Dupuis v. Van Natten,* 61 App.Div.2d 293, 402 N.Y.S.2d 242 (1978); *Renz v. Beeman,* 589 F.2d 735 (2d Cir.1978), *cert. denied,* 444 U.S. 834, 100 S.Ct. 65, 62 L.Ed.2d 43. *See also Bender v. New York City Health and Hospitals Corp.,* 38 N.Y.2d 662, 382 N.Y.S.2d 18, 345 N.E.2d 561 (1976) (government agency which wrongfully induced plaintiff's reliance is equitably estopped from raising defenses such as failure to provide notice of claim). *See generally,* 35 N.Y.Jur. *Limitations* § 17 (1964). Plaintiff argues on appeal, and defendant argued before the state court, that *Bender, supra,* has been overruled by *Matter of Hamptons Hospital and Medical Center, Inc. v. Moore,* 52 N.Y.2d 88, 436 N.Y.S.2d 239, 417 N.E.2d 533 (1981) and that equitable estoppel is unavailable against the government in state courts. However, *Hamptons* stands only for the obvious proposition that a government agency promulgating rules or making decisions in its governmental capacity cannot be equitably estopped from reconsidering prior agency decisions simply by virtue of plaintiff's reliance on the earlier decision. *Hamptons Hospital* leaves *Bender* untouched as it applies to this case; the state may

be equitably estopped from raising the defense of the statute of limitations.

**7.** The petitioner was terminated from the position of assistant public information specialist in the Division of Criminal Justice Services in August, 1975. The present proceeding was instituted by petition in August 1979, four years subsequent to the termination. The affidavit of the petitioner in opposition to the motion to dismiss is replete with statements that immediately upon being· notified of his termination "a series of inquiries was made as to what his rights and alternatives might be", and petitioner's failure to consult an attorney until 1978 cannot be charged against the respondents. Extending to petitioner every consideration on this record, he was guilty of laches, and there is no basis for a finding that he was excused for not commencing the proceeding within the statutory four-month limitation period.
*Keating v. Rogers,* 77 A.D.2d 694, 429 N.Y.S.2d 501 (1980) (citations omitted).·

the plaintiff was excused for not commencing the Article 78 action within the four month limitation period. However, a finding that the plaintiff had no excuse for not consulting with a lawyer for three years is quite different from a finding that the plaintiff had no excuse for delaying one year.

■ The defendants stress the Appellate Division's finding that the plaintiff began consulting with friends and counsel[8] and others concerning his rights immediately after he was removed from office. From this finding, the defendants would have us infer that "obviously" the plaintiff was not a man to accept the representations of the new administration at face value. · We do not find this inference obvious. And in any event, on a motion for summary judgment, we cannot rely on an unsupported inference about the plaintiff's state of mind to resolve disputed issues of fact. It may be that, in reasonable diligence, Keating consulted only with victims of or participants· in a conspiracy to conceal his tenure rights. In these circumstances, we cannot infer, from the mere finding that he consulted with others, that Keating's failure to bring this action earlier was not the result of a conspiracy to keep him out of court.

Having argued before the state court that the complaint should be dismissed because "it exceeds credibility for plaintiff to argue that he was misled for four years," defendants now urge us to construe the state court's decision as resting on a factual finding that the plaintiff was never misled at all. However, the Appellate Division could not properly have made such a finding of fact to support a judgment on the pleadings. Even if the state court had made such a finding, it would not be binding in this action. For the determination of a factual issue on an interlocutory appeal based on naught but the pleadings would have deprived Keating of a full and fair opportunity to litigate his claim that the

defendants successfully conspired to thwart his efforts to discover his cause of action. We must, of course, give the same effect to the state court judgment that would be given by other courts of that state. 28 U.S.C. § 1738 (1976); *Allen v. McCurry,* 449 U.S. 90, 96–98, 101 S.Ct. 411, 415–16, 66 L.Ed.2d 308 (1980); *LaRocca v. Gold,* 662 F.2d 144, 148 (2d Cir.1981). However, New York courts refuse to give preclusive effect to issues which have not been fully and fairly litigated in prior actions. *Gramatan Home Investors Corp. v. Lopez,* 46 N.Y.2d 481, 485, 414 N.Y.S.2d 308, 386 N.E.2d 1328 (1979).

■ For these reasons, we read the Appellate Division's opinion as finding only that the plaintiff would be unable to establish an excuse for delaying over four years. This, of course, does not preclude his establishing here that the statute should be tolled *one year* for delay induced by defendant's conduct. We reverse the district court's ruling on the collateral estoppel issue.

### III.—§ *1981*·

■ Plaintiff argues that the district court erred in dismissing his § 1981 claim for failure to allege that the defendants acted out of racial or other class-based animus. Plaintiff insists that political party membership defines a class protected by the statute from discrimination. We cannot agree. Plaintiff's position is contrary to the clear language of the statute and is unsupported by the cases.

Section 1981 guarantees to "(a)ll persons" the same rights as "enjoyed by white citizens." 42 U.S.C. § 1981 (1976). We believe that the statute's reference to rights enjoyed by *whites* establishes "the *racial* character of the rights being protected." *McDonald v. Santa Fe, supra,* 427 U.S. at 293, 96 S.Ct. at 2585, *quoting Georgia v. Rachel,* 384 U.S. 780, 791, 86 S.Ct. 1783, 1789, 16 L.Ed.2d 925 (1966) (emphasis added).[9]

---

**8.** It is not clear on this record whether Keating met with an attorney from the Civil· Service Employees Association or with a nonlegal member of the staff.

**9.** Section 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in

In any event, the race-oriented interpretation of the statutory language is firmly rooted in the legislative history. Section 1981 is the codification of part of Section 1 of the Civil Rights Act of 1866.[10] Passed in the wake of the thirteenth amendment, the act sought to eradicate both private discrimination, *Jones v. Mayer Co.*, 392 U.S. 409, 436, 88 S.Ct. 2186, 2201, 20 L.Ed.2d 1189 (1968), and public discrimination in the form of the recently enacted Black Codes—"laws which had saddled Negroes with 'onerous disabilities and burdens, and curtailed their rights . . . to such an extent that their freedom was of little value. . . .'" *Id.* at 426, 88 S.Ct. at 2196, *quoting Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 70, 21 L.Ed. 394 (1875). With these concerns in mind, Congress focused on "the limited problem of racial discrimination against blacks rather than the broader concepts of 'equal protection' for all groups developed under the Fourteenth Amendment." Note, *Section 1981 and Private Groups*, 84 Yale L.J. 1441, 1445 n. 19 (1975).

In the absence of allegations of racial animus, courts have rejected § 1981 complaints challenging discrimination based on national origin and cultural characteristics common to ethnic or national groups. *See Patel v. Holley House Motels*, 483 F.Supp. 374, 382–83 (S.D.Ala.1979); *Foreman v. General Motors Corp.*, 473 F.Supp. 166, 177 (E.D.Mich.1979); *Plummer v. Chicago Journeyman Plumbers' Local Union No. 130,* *U.A.*, 452 F.Supp. 1127, 1142 (N.D.Ill.1978), *rev'd on other grounds*, 657 F.2d 890 (7th Cir.1981). Similarly courts have rejected claims based on discrimination against economically disadvantaged persons, *Foreman v. General Motors Corp.*, supra, at 177–78, as well as claims based on age discrimination, *Kodish v. United Air Lines, Inc.*, 628 F.2d 1301, 1303 (10th Cir.1980). Thus, although the courts have not limited the statute's proscription of racial discrimination by employing a "technical or restrictive meaning" of "race," *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 971 (10th Cir. 1979),[11] neither have they strayed far from a racial discrimination analogy.

As noted above, the Supreme Court has read the statute generously as providing racial equality for all, *McDonald v. Santa Fe Trail Transportation Co.*, supra, 427 U.S. at 295–96, 96 S.Ct. at 2585–86. In light of the Court's interpretation, the legislative history, and the express language of the statute, we hold that § 1981, however generously construed, does not prohibit discrimination on the basis of political affiliation.

## IV.—§ 1985

Keating argues that a claim under part (2) of § 1985 does not require a showing of class-based discrimination and that Republicans are a protected class under part (3). We agree and consequently reverse the dismissal of those claims in Keating's complaint.

---

every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

The reference to "white citizens" was not intended to limit the otherwise broad language of the statute protecting "all persons," including whites, from discrimination on account of race. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 295–96, 96 S.Ct. 2574, 2585–86, 49 L.Ed.2d 493 (1976). Rather, the phrase "as. . . .enjoyed by white citizens," was added only to ensure that the statute would not be construed as extending the enumerated rights to "all persons" regardless of sex or age. *See Cong.Globe*, 39th Cong., 1st Sess. app. 157

(1866) (remarks of Congressman Wilson). Nonetheless, the language of this attempt to limit the scope of the Act would have been inappropriate had Congress intended the bill to prohibit nonracial discrimination.

**10.** The statute was reenacted under the fourteenth amendment as part of the Enforcement Act of 1870. For the effects of the reenactment on the state-action requirement, *see* H. Friendly, *Federal Jurisdiction* 83 n. 41 (1973); Note, *The Expanding Scope of Section 1981*, 90 Harv. L.Rev. 412, 417–19 & n. 42 (1976). *See also Runyan v. McCrary*, 427 U.S. 160, 169 n. 8, 96 S.Ct. 2586, 2594 n. 8, 49 L.Ed.2d 415 (1976).

**11.** *See, e.g., Aponte v. National Steel Service Center*, 500 F.Supp. 198 (N.D.Ill.1980); *Patel v. Holley House Motels*, 483 F.Supp. 374, 393 (S.D.Ala.1979).

## A. § *1985(2)*

The first clause of § 1985(2), originally enacted as part of the Ku Klux Klan Act of 1871, makes it unlawful for "two or more persons ... [to] conspire to deter, by force, intimidation, or threat, any party ... in any court of the United States from attending such court...." Keating argues that this section outlaws all such interference, regardless of whether it is based on discriminatory animus.

The plain language of the statute does not require a claim of discrimination to state a cause of action under the first clause of part (2). In *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the Supreme Court addressed the same issue under part (3). The Court held that the language in part (3) "requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action." *Id.* at 102, 91 S.Ct. at 1798 (emphasis in the original). By contrast, the first clause of part (2) makes no reference to *equal* protection. Thus, while the second clause of part (2) makes it unlawful to obstruct the course of justice in *state* courts "with the intent to deny to any citizen the *equal* protection of the laws," (emphasis added) the first clause simply outlaws *all* interference with any person's attempt to attend federal court.

Nothing in the legislative history justifies a narrow interpretation that fails to give effect to the statute's express terms by requiring a showing of discriminatory animus. Indeed, the broader interpretation adopted by the D.C. Circuit in *McCord v. Bailey,* 636 F.2d 606, 614–17 (D.C.Cir.1980), *cert. denied,* 451 U.S. 983, 101 S.Ct. 2314, 68 L.Ed.2d 839 (1981), is consistent with Congress' affirmative purposes in enacting the Ku Klux Klan Act of 1871.

The five years after the founding of the Klan in 1866 were characterized by massive and violent resistance to federal reconstruction, including the assassination of government officials. *Cong.Globe,* 42nd Cong., 1st Sess. 654, col. 1 (1871) (remarks of Senator Osborn). Pervasive disorder made even such prosaic tasks as "the carrying of the mails and the collection of the revenue dangerous." *Cong.Globe,* 42nd Cong., 1st Sess. 244 col. 3 (1871) (message of President Grant). Disorders were so great as to "paralyze the power of local authorities" and render the courts "unable to administer the laws of the United States." *Cong.Globe,* 42nd Cong., 1st Sess. 487, col. 3 (1871) (remarks of Congressman Tyner). Against this background, President Grant asked Congress for a bill to empower the federal government to quell the reigning anarchy. Congress responded with the Ku Klux Klan Act—a bill designed to restore civil authority and preserve orderly government. *Kimble v. D.J. McDuffy, Inc.,* 648 F.2d 340, 350 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981). We agree with Judge Tamm in his opinion for the D.C.Circuit that "[r]einforcing the sanctity of the federal judicial process for *all* citizens was one objective Congress had in mind" when it passed the Act. *McCord v. Bailey,* 636 F.2d 606, 615 (D.C.Cir.1980), *cert. denied,* 451 U.S. 983, 101 S.Ct. 2314, 68 L.Ed.2d 839 (1981).

As the Supreme Court made clear in *Griffin, supra,* Congress added the restricting equal protection language solely because, notwithstanding its broad concern with the restoration of civil authority, Congress was worried about the constitutional difficulties inherent in an unlimited proscription of violence. Congress did not want to federalize all state tort law. No such concerns attended the enforcement of a law designed to give effect to Congress' broad and undisputed power to protect the jurisdiction and the process of the federal courts. *See McCord v. Bailey, supra,* at 616–18. The proscription of interference with the course of justice in the federal courts does not threaten to swallow up all tort law. Thus, none of the concerns that forced Congress to narrow the scope of part (3) or the second clause of part (2) are applicable to the first clause. Finally, nothing in the legislative history suggests that Congress was interested in protecting the federal ju-

dicial process only from those assaults motivated by discriminatory animus.

Under the plain language of the statute, a claim under the first clause of part (2) requires no showing of class-based discrimination. The qualifying equal protection language found in the surrounding portions of the statute has been omitted from this portion. Our examination of the legislative history convinces us that this omission was deliberate.[12] We hold that the plaintiff need not show class-based discrimination to prevail on a claim, under the first clause of § 1985(2).[13]

12. Last week, on April 4, 1983, the Supreme Court agreed. *Kush v. Rutledge,* —— U.S. ——, 103 S.Ct. 1483, 74 L.Ed.2d 413. For the reasons stated in the text, *supra,* the Court held that the first clause of § 1985(2) did not require a showing of class-based discrimination. The Court expressly adopted the "accurate[ ] and persuasive[ ]" discussion of the legislative history in *McCord v. Bailey, supra,* at 615–17. *Kush, supra,* —— U.S. at ——, n. 10, 103 S.Ct. at 1488 n. 10. The Court's opinion resolved the prior split in the circuits concerning the construction of § 1985(2). *Compare Rutledge v. Arizona Board of Regents,* 660 F.2d 1345, 1454–55 (9th Cir.1981) (first clause of § 1985(2) does not require showing of class-based discrimination), *aff'd sub nom Kush v. Rutledge,* —— U.S. ——, 103 S.Ct. 1483, 74 L.Ed.2d 413 (1983), *McCord v. Bailey, supra,* at 614–17 (same), *and Brawer v. Horowitz,* 535 F.2d 830, 840 (3d Cir.1976) (same), *with Kimble v. McDuffy, Inc., supra,* at 345–47 (class-based discrimination required) *and Jones v. United States,* 536 F.2d 269, 271 (8th Cir.1976) (same).

13. We express no opinion as to whether, aside from the question of class-based discrimination, Keating has successfully stated a claim under § 1985(2). We note that the Fifth Circuit's narrow *en banc* majority in *Kimble v. McDuffy, supra,* held that a conspiracy to deter a party from "attending" federal court did not include a conspiracy to deter a party from filing a suit in federal court. *Id.* at 347–48. The *Kimble* dissent expressly disagreed. *Id.* at 353–54. Since the parties have not argued the issue before us, and it does not appear that this ground for dismissal was presented to the district court, we do not pass on this issue. We note more generally that the scope of § 1985(2) is unsettled and that on remand the district court, in its discretion, may require the plaintiff to amend his complaint to state the grounds of the § 1985(2) claims with greater specificity. Similarly, we express no opinion as to whether the defendants' conduct constitutes the use of "force, threat, or intimidation" within the meaning of the statute. By declining to reach

**B.—§ *1985(3)***

The plaintiff also argues that the district court erred in dismissing his § 1985 claims, because Republicans are a protected class under part (3) of the statute.[14] The district court actually stated that the plaintiff had failed to allege any class-based discrimination whatsoever. However, the court also noted that the plaintiff claimed that the defendants had fired him because of his Republican affiliations. The district court apparently felt that Republicans were not a protected class under the statute. We

this issue, we do not, as the dissent asserts, "ignore[ ] the limited purpose and historical origin of this statute." We simply decline to pass upon a factual and legal question not presented by the record and not argued below or on appeal. We must leave it to the district court to decide what sorts of threatening or coercive acts the plaintiff may prove and whether such acts are prohibited by the statute, in light of its history and purpose.

14. 42 U.S.C. § 1985(3) (Supp. IV 1980) provides:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

cannot agree. The statute protects against at least this form of political discrimination.

A narrow interpretation of the statute as protecting only blacks and other analogously oppressed minorities is untenable in light of the history of the Act. As noted above, the Ku Klux Klan Act was a response to President Grant's request for legislation empowering the federal government to end the Klan's anarchic tyranny and reestablish civil order. A century later, the view of the Act is apt to be distorted by the current perception of the Klan as a racist organization. The Congress of 1871, however, did not view the Klan solely as a racist organization to oppress blacks but as a political organization intent on establishing Democratic hegemony in the South. The Senate Select Committee to Investigate Alleged Outrages in the Southern States concluded that the Klan "has a political purpose, is composed of members of the democratic or conservative party, [and] has sought to carry out its purposes by murders, whippings, intimidations, and violence." [15] H.R. Rep. No. 1, 42nd Cong., 1st Sess. xxx, xxxii (1871).

Congress believed that the victims of this violence were carpetbaggers or "men of Union sentiment," in a word, Republicans. Black or white, "the victims whose property is destroyed, whose persons are mutilated, whose lives are sacrificed, are always Republicans." Cong.Globe, 42nd Cong., 1st Sess. 412, col. 3, 413, col. 1 (1871) (remarks of Congressman Roberts). "The dead and the wounded, the maimed and the scourged, are all, all Republicans." Id. at 426, col. 3 (remarks of Congressman McKee). "[E]very victim of Ku Klux outrage has been a Republican." Id. at 437, col. 2 (remarks of Congressman Cobb). The Klan's object is "the defeat of Republicanism." Id. at app. 196, col. 2 (remarks of Congressman Snyder). The Klan's "systematic plan . . . is not to leave in any of those States a brave white man who dares to be a Republican or a colored man who dares to be a voter." Id. at 702, col. 1 (remarks of Senator Edmunds).[16] The Klan's "purpose is by these inumerable and nameless crimes to drive those who are supporting the Republican Party to abandon their political faith or to flee from the state" (or at least to quit their jobs in the state civil service). Id. at app. 252, col. 1 (remarks of Senator Morton). Finally, those "who vote with the party . . . or who accept a petty office from a Republican Administration, are in much of the country continually in imminent peril for their lives." Id. at 654, col. 1 (remarks of Senator Osborn).

In our view, Congress did not seek to protect only Republicans, but to prohibit political discrimination in general.[17] At

---

**15.** See also Cong.Globe, 42nd Cong., 1st Sess., 320–22 (1871) (remarks of Congressman Stoughton); id. at 391, col. 2–3 (remarks of Congressman Elliott); id. at 412, col. 3, 413, col. 1 (remarks of Congressman Roberts).

**16.** Cf. the remarks of Congressman Stoughton recounting the testimony of one man who claimed that the Klan only disturbed those blacks who voted Republican and left unmolested those who voted the conservative ticket. Cong.Globe, 42nd Cong., 1st Sess. 321, col. 1–2 (1871) (quoting H.R.Rep. No. 1, 42nd Cong., 1st Sess., 345 (1871)).

**17.** In asserting that Republicans were attacked by the Klan and thus protected by the Act "because they were supporters of the rights of blacks, not because they were members of the Republican party," the dissent views the Klan's response to Reconstruction outside of its historical context. The tensions that erupted following the Civil War had their source, at least in part, in the ante bellum social and economic disparities between the increasingly urban and industrialized North, and the relatively poorer, agrarian South, and in the consequent Southern resentment of what the South considered to be Northern social condescension and economic exploitation. This nonracially related hostility towards carpetbaggers, those of Republican persuasion, was greatly enhanced by the Northern occupation. Much of the South regarded as vindictive and corrupt the radical Republican Reconstruction governments, which took as their aims, in addition to providing civil rights for blacks, the social and economic transformation of the South. In enacting the Civil Rights Act of 1871, Congress sought, among other things, to contain this extraordinarily heated dispute within lawful democratic processes and to prohibit acts of political recrimination that deprived their victims of equal privileges and immunities or the equal protections of the laws.

least one informed Republican Senator acknowledged that the Act would have to be applied to conspiracies against a man "because he was a Democrat ... or ... a Catholic, ... or ... a Methodist, ... or ... a Vermonter." *Cong.Globe,* 42nd Cong., 1st Sess. 567, col. 2 (1871) (remarks of Senator Edmunds of Vermont).

Nothing in the many cases applying the statute to racial discrimination suggests that we should now turn history on its head and exclude from protection the group that seems to have been foremost in the mind of Congress. Indeed, several courts have held that political discrimination is prohibited by § 1985. *See, e.g., Means v. Wilson,* 522 F.2d 833, 839–40 (8th Cir.1975), *cert. denied,* 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976); *Glasson v. City of Louisville,* 518 F.2d 899, 911–12 (6th Cir.), *cert. denied,* 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975); *Cameron v. Brock,* 473 F.2d 608, 610 (6th Cir.1973); *see also, Kimble v. D.J. McDuffy, Inc.,* 648 F.2d 340, 347 n. 9 (5th Cir.) (*en banc*) (dicta) ("section 1985 was certainly intended to cover conspiracies against Republicans"), *cert. denied,* 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981); Comment, *Private Conspiracies to Violate Civil Rights,* 90 Harv.L.Rev. 1721, 1728 (1977) ("the legislative history behind section 1985(3) points unmistakably to the conclusion that discrimination on [the basis of political affiliations or beliefs] was intended to be actionable"); *cf. Hampton v. Hanrahan,* 600 F.2d 600, 623 & n. 22 (7th Cir.1979) (§ 1985 reaches discrimination based on political affiliation with racial overtones),

modified on other grounds, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980).

We hold that Keating's allegations that the defendants conspired against him because he was a Republican satisfies the *Griffin* requirement under § 1985(3) of class-based discriminatory animus.[18]

### V.

To summarize, Keating is entitled to a trial to determine the facts regarding his delay in bringing this action. If the court finds that the delay was excusable, then Keating will be entitled to a trial on his § 1983 claim to determine his tenure rights under New York law and the terms and conditions of his employment. We have addressed the merits of Keating's remaining claims only so far as necessary to resolve the question whether he was required to allege class-based discrimination for causes of action under §§ 1981, 1985(2) and 1985(3) and whether his allegations suffice to meet that requirement. Having found the allegations of political discrimination sufficient under § 1985(3) and unnecessary under § 1985(2), we remand for further proceedings, not inconsistent with this opinion.

MESKILL, Circuit Judge, concurring and dissenting:

I concur with the majority's resolution of the claims based on 42 U.S.C. §§ 1981, 1983 (1976 & Supp. IV 1980). However, I cannot agree with the majority's view that Keating's complaint states a cause of action under clauses (2) and (3) of 42 U.S.C. § 1985

---

18. Whether the discrimination alleged here was actually invidious or improper is a legal and factual question not argued on appeal and a matter for the district court in the first instance. Whether political discrimination in employment is "invidious" might turn on the nature of the position and the tenure protections guaranteed to the employee. We hold only that Republicans are a protected class within the meaning of the statute; we express no opinion as to whether the defendants' conduct actually constituted the sort of invidious deprivation of equal protection or equal privileges and immunities sanctioned by the statute.

In concluding that this case presents "at most a classic example of patronage," and that

"Keating never took steps" to "ensure that his tenured status [was] preserved," the dissent makes assumptions of facts which are plainly contrary to the allegations in the complaint. On a motion for summary judgment on the limited grounds of collateral estoppel on a statute of limitations defense and on the ground that the § 1985 claims fail to state cause of action, we must take as true those allegations in the complaint that have not been controverted on this motion and that have not been determined in prior litigation. Thus, we must assume, as the complaint asserts, that Keating *did* have tenure and that the defendants lied when they told him otherwise.

(Supp. IV 1980). Section 1985 was never intended, in my judgment, to afford legal protection from the type of conduct alleged to have occurred. Moreover, regardless of one's view concerning the scope of section 1985, I believe it ill-advised to decide these far-reaching questions of law on the basis of a record which reveals that the section 1985 claims were at best an afterthought and were never seriously considered by either the parties or the district court.

Section 1985 has its historical roots in the Civil Rights Act of 1871 (1871 Act), ch. 22, § 2, 17 Stat. 13, which is commonly referred to as the Ku Klux Klan Act. *See Griffin v. Breckenridge,* 403 U.S. 88, 98–99, 91 S.Ct. 1790, 1796, 29 L.Ed.2d 338 (1971); *Kimble v. D.J. McDuffy, Inc.,* 648 F.2d 340, 344–45 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981). The legislative debates preceding passage of the 1871 Act expose two major focuses of congressional concern. First, and certainly foremost in the mind of Congress at that time, was a fear that widespread violence and vigilantism in the post-war South threatened the entire fabric of Southern society. *See Cong.Globe,* 42nd Cong., 1st Sess. 344 (remarks of Sen. Davis); 348 (remarks of Sen. Wilson); 386 (remarks of Rep. Lewis) (1871); *see also Stern v. United States Gypsum, Inc.,* 547 F.2d 1329, 1334 (7th Cir.), *cert. denied,* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977). Reports from the South in the aftermath of the Civil War indicated that the movement from slave to freehold society was being accomplished with only limited success. *See Cong.Globe,* 42nd Cong., 1st Sess. 369 (remarks of Rep. Sheldon); 384 (remarks of Rep. Hawley). Bands of men, principally Southern Democrats aligned with the Ku Klux Klan, had joined together in violent resistance to the proposed changes of the Reconstruction Era. Reports of lynchings and mob violence against blacks and black supporters were legion. *Id.* at 348 (remarks of Sen. Wilson); 358 (resolution of Sen. Sherman).

The majority in Congress was especially troubled by the inability or unwillingness of Southern governments and state judges to stem this tide of violence:

> So, sir, it comes to this: by the united voice of this House, of gentlemen upon both sides of this House, these alleged outrages in the southern States do exist. Men are murdered; their property is burned or otherwise destroyed; they are scourged, and the local law is not administered so as to demonstrate its power to reach these offenses or to defend the citizens who are subject to them.

*Id.* at 392 (remarks of Rep. Smith); *see id.* at 368 (remarks of Rep. Sheldon) ("The great difficulty in the South today is a want of moral power on the part of the State governments. Whatever disorders prevail are traceable to this cause more than to any other.").

The second major theme running through the civil rights debates in 1871 focused on the doctrine of federalism, and particularly on the proper degree of federal intervention into the local affairs of the states. The legislative history reveals lingering tensions between Congressmen from the North and South in the aftermath of the Civil War. While most conceded that some problems existed in the South during the Reconstruction Era, legislators from that region downplayed the severity of the threat and asserted that the individual states were fully capable of controlling their particular internal problems. *Id.* at 346 (remarks of Sen. Davis); 363 (remarks of Rep. Swann). Legislators from the North, almost exclusively Republicans, appeared less convinced; they urged that a greater degree of federal control was necessary to facilitate a peaceful transition from a slave to a freehold society. *See id.* at 349 (remarks of Sen. Morton); 392 (remarks of Rep. Smith).

The Civil Rights Act of 1871 [1] was born of this important historical debate. As adopted, the 1871 Act specifically addressed the

---

1. Section 2 of the 1871 Act, which is the historical antecedent of both section 1985(2) and (3), provides in pertinent part:

> That if two or more persons within any State or Territory of the United States shall conspire together to overthrow, or to put down, or to destroy by force the government

concerns raised by Congress. Those harassed and threatened by rampant vigilantism, notably blacks and black supporters in the South, were afforded a remedy to vindicate their civil rights. Groups threatened by the wave of racial/political violence were assured access to the courts and polls. Finally, by extending federal jurisdiction over these matters, the 1871 Act reflected Congress' concern that the individual Southern states were either unwilling or unable to deal with these compelling problems. Although noble in purpose, the objective of the 1871 Act was limited, namely, to protect blacks and black sympathizers from rampant vigilantism in the South and to ensure these oppressed groups access to the courts and polling places. Unfortunately,

of the United States, or to levy war against the United States, or to oppose by force the authority of the government of the United States, or by force, intimidation, or threat to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof, or by force, intimidation, or threat to prevent any person from accepting or holding any office or trust or place of confidence under the United States, or from discharging the duties thereof, or by force, intimidation, or threat to induce any officer of the United States to leave any State, district, or place where his duties as such officer might lawfully be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or to injure his person while engaged in the lawful discharge of the duties of his office, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duty, or by force, intimidation, or threat to deter any party or witness in any court of the United States from attending such court, or from testifying in any matter pending in such court fully, freely, and truthfully, or to injure any such party or witness in his person or property on account of his having so attended or testified, or by force, intimidation, or threat to influence the verdict, presentment, or indictment, of any juror or grand juror in any court of the United States, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or on account of his being or having been such juror, or shall conspire together, or go in disguise upon the public highway or upon the premises of another for the purpose, either directly or indirectly, of depriving any person or any class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State from giving or securing to all persons within such State the equal protection of the laws, or shall conspire together for the purpose of in any manner impeding, hindering, obstructing, or defeating the due course of justice in any State or Territory, with intent to deny to any citizen of the United States the due and equal protection of the laws, or to injure any person in his person or his property for lawfully enforcing the right of any person or class of persons to the equal protection of the laws, or by force, intimidation, or threat to prevent any citizen of the United States lawfully entitled to vote from giving his support or advocacy in a lawful manner towards or in favor of the election of any lawfully qualified person as an elector of President or Vice-President of the United States, or as a member of the Congress of the United States, or to injure any such citizen in his person or property on account of such support or advocacy, each and every person so offending shall be deemed guilty of a high crime, and upon conviction thereof in any district or circuit court of the United States or district or supreme court of any Territory of the United States having jurisdiction of similar offences, shall be punished by a fine not less than five hundred nor more than five thousand dollars, or by imprisonment, with or without hard labor, as the court may determine, for a period of not less than six months nor more than six years, as the court may determine, or by both such fine and imprisonment as the court shall determine. And if any one or more persons engaged in any such conspiracy shall do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby any person shall be injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the person so injured or deprived of such rights and privileges may have and maintain an action for the recovery of damages occasioned by such injury or deprivation of rights and privileges against any one or more of the persons engaged in such conspiracy, such action to be prosecuted in the proper district or circuit court of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like case in such courts under the provisions of the act of April ninth, eighteen hundred and sixty-six, entitled "An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication."

Act of April 20, 1871, ch. 22, § 2, 17 Stat. 13.

the Congress of 1871 accomplished this limited purpose through the use of extraordinarily broad language, therein causing confusion over the intended scope of the Civil Rights Act.

There have been comparatively few cases decided under 42 U.S.C. § 1985. *See Kimble v. D.J. McDuffy, Inc.,* 648 F.2d 340, 345 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981); *Brawer v. Horowitz,* 535 F.2d 830, 840 (3d Cir.1976). The Supreme Court has admitted that "[m]ore than a century after their passage, the Civil Rights Acts of the Reconstruction Era continue to present difficult problems of statutory construction." *Great American Federal Savings & Loan Association v. Novotny,* 442 U.S. 366, 368, 99 S.Ct. 2345, 2346, 60 L.Ed.2d 957 (1979). Predictably, the reported decisions construing section 1985 have produced myriad, often irreconcilable, results. *Compare Kimble v. D.J. McDuffy, Inc.,* 648 F.2d at 347 (group of individuals allegedly discriminated against for submitting personal injury or workers' compensation claims are not a protected class); *DeSantis v. Pacific Telephone and Telegraph Co.,* 608 F.2d 327, 333 (9th Cir.1979) (homosexuals not a protected class); *Hahn v. Sargent,* 523 F.2d 461, 469 (1st Cir.1975) (former chairman of Massachusetts Republican Party failed to show that his political defeat was due to class-based discrimination), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976); *Bellamy v. Mason's Stores, Inc.,* 508 F.2d 504, 506–07 (4th Cir.1974) (no section 1985 violation where private employer discharges employee due to his affiliation with Ku Klux Klan); *Hutchens v. Beckham,* 521 F.Supp. 426, 429 (S.D.Ga.1981) (neighborhood newspaper publishers not a protected class), *with Scott v. Moore,* 680 F.2d 979, 994 (5th Cir.1982) (class of non-union employees and employer subjected to union violence held to be protected class); *Cooper v. Molko,* 512 F.Supp. 563, 569 (N.D.Cal. 1981) (members of Unification Church held to be protected class). The majority's decision must be scrutinized in light of the legislative and judicial history of the 1871 Act.

## A. *Claim Under Section 1985(2)*

Section 1985(2) provides in pertinent part:

> If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws.

42 U.S.C. § 1985(2) (Supp. IV 1980).

Keating's complaint raises two difficult questions of law concerning section 1985(2). First, whether the person seeking protection under section 1985(2) is required to allege that the conspirator's actions were motivated by racial or otherwise class-based discriminatory animus. Second, whether the actions alleged to have occurred are characteristic of the type of conduct proscribed by section 1985(2). The majority here answers the first question by holding that every individual, regardless of race, sex or group membership, is entitled to protection under section 1985(2). In view of the Supreme Court's decision in *Kush v. Rutledge,* —— U.S. ——, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983), I agree with this holding. I do not agree, however, with the majority's failure to delimit the type of

conduct proscribed by the statute, leaving that question for another day.

A fair reading of the legislative history of the 1871 Act, the predecessor to section 1985, suggests that it was intended principally to assist blacks and black supporters in the post-war South as they struggled to preserve. their newly-won freedoms. The 1871 Act reflected a congressional judgment that special protections should be afforded those citizens who were being victimized by brutal and senseless acts of violence during the Reconstruction Era. *See, e.g., Cong.Globe,* 42nd Cong., 1st Sess. 348 (remarks of Sen. Wilson); 358 (resolution of Sen. Sherman) (1871). The majority makes a quantum, and to my judgment regrettable, leap by holding that a veiled threat of political recrimination against a white New York Republican in the 1970s may be sufficient to satisfy the "force, intimidation or threat" component of section 1985(2).

Hence, my disagreement with the majority is quite fundamental. I would require evidence of physical force, threats of violence or similarly malevolent acts, while the majority sees no need to identify "proscribed conduct" at this time.[2] By failing to provide meaningful legal parameters around section 1985(2), the majority ignores the limited purpose and historical origin of this statute. *See DeSantis v. Pacific Telephone and Telegraph Co.,* 608 F.2d 327, 333 (9th Cir.1979); *Amoco Oil Co. v. Local 99, International Brotherhood of Electrical Workers, AFL–CIO,* 536 F.Supp. 1203, 1213 n. 20 (D.R.I.1982).

The majority's holding is particularly ill-advised given the nature of these proceedings. Review of the record shows that the section 1985 claim was treated as an afterthought by the parties and the district court. The appellant alleges in the first paragraph of his complaint a claim under section 1985, but makes no effort in the remaining fifty-nine paragraphs to identify those facts that support his cause of action or to delimit the specific subpart of section 1985 upon which he relies. At the end of his complaint, appellant summarizes his allegations into two general causes of action, but does not refer to section 1985 within that summary. His affidavit also fails to identify the factual or legal grounds for his section 1985 claim, except perhaps through brief and cursory mention that supervisory Democrats "threatened" him with political recrimination if he sought legal redress in the courts. Because we are remanding this case, the plaintiff may seek to. amend his complaint to identify more precisely the grounds for his section 1985 claim and thereby enable the district court to undertake a reasoned analysis of this issue. Regardless of one's ultimate view concerning the protections afforded by section 1985, we should decline to decide this far-reaching question of law on the present record.

### B. *Claim Under Section 1985(3)*

Section 1985(3) provides:

If two or more persons in any State or Territory conspire or go in disguise.on the highway or on the premises of another,

---

**2.** The majority holds that Keating satisfies the pleading requirements of section 1985(2) by alleging cursorily in his complaint that supervisory democrats in the Carey administration threatened him with political recrimination if he commenced legal proceedings seeking to retain his job. Although the pleading requirements of Fed.R.Civ.P. 8 are quite liberal, *see New York State Waterways Association v. Diamond,* 469 F.2d 419, 421 (2d Cir.1972), this Circuit has consistently "held that complaints containing only 'conclusory,' 'vague,' or 'general allegations'" cannot survive a motion to dismiss. *Contemporary Mission, Inc. v. United States Postal Service,* 648 F.2d 97, 107 (2d Cir.1981) (citing *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977)). There is no affidavit or record support for Keating's claim of political threats, nor is there any colorable allegation that Keating decided to forego litigation largely due to defendants' alleged "scare tactics." Moreover, even if Keating were able to sustain his claim of "political threat," in my judgment there is a serious qualitative difference between a mere threat of political recrimination and the brutal physical acts of violence and intimidation perpetrated by groups like the Ku Klux Klan in the Reconstruction Era South. In keeping with my narrow, historical view of section 1985, I would require a threshold higher than mere political threat before finding that plaintiff's complaint states a cause of action under section 1985(2).

for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3) (Supp. IV 1980). Section 1985(3) has generated considerably more litigation than section 1985(2) and the reported decisions demonstrate the range of views held by the federal courts over the scope of this section. *See, e.g., Hampton v. Hanrahan,* 600 F.2d 600, 623 & n. 22 (7th Cir.1979) (section 1985(3) reaches discrimination based on political affiliation with racial overtones), *modified on other grounds,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980); *Carchman v. Korman Corp.,* 594 F.2d 354, 356 (3d Cir.) (section 1985(3) protects "victims of historically pervasive discrimination" and those with "immutable characteristics"), *cert. denied,* 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979); *see also DeSantis v. Pacific Telephone and Telegraph Co.,* 608 F.2d 327, 333 (9th Cir.1979) (homosexuals not protected);

*Bellamy v. Mason's Stores, Inc.,* 508 F.2d 504, 506–07 (4th Cir.1974) (members of Ku Klux Klan not protected); *Cooper v. Molko,* 512 F.Supp. 563, 568 (N.D.Cal.1981) (members of Unification Church entitled to protection under 1985(3)).

Amid this sea of confusion, the majority holds that Republicans as a class are entitled to protection under section 1985(3), but declines to decide whether the acts alleged to have occurred here are within the zone of conduct proscribed by the statute. My views concerning the intended reach of section 1985(2) apply with equal force here. Section 1985(3) also finds its historical roots in the 1871 Act, legislation adopted for the purpose of ensuring that blacks and black sympathizers in Reconstruction Era South would be protected from senseless acts of vigilantism. Understood in its proper historical perspective, the 1871 Act evidences a concern that politically impotent groups who fall victim to mass recrimination—racial, political or otherwise—be guaranteed equal protection of the laws. Because the majority opinion treads well beyond these bounds, I respectfully dissent.

The majority correctly observes that Republicans as a group were among those mentioned in the legislative history of the 1871 Act as deserving protection. *See* Cong.Globe, 42d Cong., 1st Sess. 702 (1871) (remarks of Rep. McKee). The majority overlooks, however, the unique historical circumstances that gave rise to a need to protect Republicans. As is commonly known, Lincoln Republicans of the 1860s and 1870s were the major political force behind black emancipation. To the extent that support for black rights was evidenced in the South, it was from white Republicans who were a small minority in that region. Not surprisingly, the Ku Klux Klan and other groups determined to achieve democratic hegemony in the South directed their physical assaults and threats of violence against both emancipated blacks and their Republican supporters. To counter this threat, the Civil Rights Acts were enacted to ensure that those denied access to the polls and the courthouse due to mob vio-

lence and vigilantism would be protected by the federal courts.

Taken out of historical context, it would seem that the only requirement of Republicans for protection under section 1985(3) is that they be victims of discrimination. This view, however, does not comport with the underlying purpose of the 1871 Act. The general intent of this legislation was very narrow—to protect blacks and black supporters in the post-Civil War South. The majority's expansive interpretation of section 1985(3) is inconsistent with the underlying theme of the 1871 Act, namely, to afford federal protection to those historically disadvantaged groups who are unable, through the political process, to protect themselves from invidious discrimination. *See Carchman v. Korman Corp.,* 594 F.2d 354, 356 (3d Cir.), *cert. denied,* 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979); *Bricker v. Crane,* 468 F.2d 1228, 1232 (1st Cir. 1972), *cert. denied,* 410 U.S. 930, 93 S.Ct. 1368, 35 L.Ed.2d 592 (1973); *Orshan v. Anker,* 489 F.Supp. 820, 823 (E.D.N.Y.1980); *Perrotta v. Irizarry,* 430 F.Supp. 1274, 1278 (S.D.N.Y.), *aff'd,* 573 F.2d 1294 (2d Cir. 1977). Indeed, Republicans can and do gain political power by getting elected to public office. Those Republicans who were protected by the 1871 Act were protected because they were supporters of the rights of blacks, not because they were members of the Republican Party. The plaintiff here is not in that protected category. If Keating lost his job because he is a Republican, he lost his job because his party was no longer in power, not because he is a member or supporter of an historically disadvantaged group.

Prior to today, this Circuit has taken a narrower view of section 1985(3) than that advanced by the majority. In *Perrotta v. Irizarry,* the district court, affirmed by this Court, held that section 1985(3) requires discrimination based on "racial bias, national origin or religion," and further that the alleged class must be well defined and an historically disadvantaged group. 430 F.Supp. 1274, 1278 (S.D.N.Y.), *aff'd,* 573 F.2d 1294 (2d Cir.1977); *see Orshan v. Anker,* 489 F.Supp. 820, 823 (E.D.N.Y.1980).

*Perrotta* accords proper weight to the historical purposes of section 1985(3) and I would adhere to it. *See DeSantis v. Pacific Telephone and Telegraph Co.,* 608 F.2d 327, 333 (9th Cir.1979); *Amoco Oil Co. v. Local 99, International Brotherhood of Electrical Workers, AFL–CIO,* 536 F.Supp. 1203, 1213 n. 20 (D.R.I.1982). The majority moves well beyond this limited view by holding that Republicans are a protected class under section 1985(3). As I understand the majority opinion, any firing based on political affiliation can state a cause of action under 1985(3). The potential ramifications of this decision, as with the section 1985(2) holding, are extraordinary.

The pleadings reveal that Mr. Keating's termination was at most a classic example of political patronage—the spoils system at work. One presumably accepts appointive public office with the understanding that the "spoils" of politics have historically gone to the victor. Indeed, Keating's record as a staunch Republican supporter undoubtedly helped him to get his job from the Republican administration in the first place. If the appointee's understanding is different, he presumably takes steps to ensure that his tenured status is preserved while the "friendly" administration remains in power. Keating never took steps to protect himself and thereafter fell victim to the patronage system with the shifting of the political winds. If he prevails on remand by showing that his discharge was motivated by political affiliation, all firings based upon political patronage will henceforth be outlawed. One may debate the merits *vel non* of the patronage system, but I would resist any effort to read an anti-patronage intent into Reconstruction Era Ku Klux Klan legislation. The Congress of 1871 could not have contemplated that the Civil Rights Acts would strike the death knell to a way of political life that flourished then and remains an accepted incident of elective office. If the 1871 Act was intended to have had such a broad sweep, there would have been no need for the civil service system established by Congress twelve years later. Pendleton Act, ch. 27, 22 Stat. 403 (1883).

The Supreme Court's decision in *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), provides a good example of the type of conduct proscribed by section 1985(3). There, two white men conspired to detain and brutally assault the occupants of a car on the mistaken assumption that the driver of the vehicle was a "worker for Civil Rights for Negroes" in the South during the 1960s. *Id.* at 90, 91 S.Ct. at 1792. The *Griffin* Court found that the acts alleged by the plaintiffs were within the zone of conduct protected by section 1985(3), but admonished the courts and future litigants to respect the limited reach of the statute:

> The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors . . . .

*Id.* at 102, 91 S.Ct. at 1798. The acts of political patronage alleged by Mr. Keating do not remotely resemble the "kind of invidiously discriminatory motivation stressed by the sponsors [of the Ku Klux Klan Act]."

Finally, my concerns relating to the inadequacy of the record apply with equal force to the section 1985(3) claim. I believe it ill-advised to decide this far-reaching question of law on the present record. The parties and the district court treated the section 1985 claim as an afterthought—it was never seriously briefed by the parties or analyzed by the court. Keating has failed to state the grounds for his 1985 claim, to point to the facts that support his action and to identify the subsection of 1985 under which he seeks relief. We should not attempt to fill in the gaps. Having done so, however, we should not ignore history as the majority does here.

I dissent from the majority's views on the section 1985 issues.