**Henry PLATSKY, Plaintiff,**

v.

**Doris KILPATRICK, Maria Cruz, Albert Cruz, the Majestic Hotel, the New York Urban Coalition Housing Group, Gregory Cohen, Donald Elliot, Steven Cohen, Seth Miller, Cindy Freidmutter, Inspector Quinlan, Detective Maley, and the 84th Precinct of the New York City Police Department, Defendants.**

No. CV–91–3292.

United States District Court, E.D. New York.

Nov. 4, 1992.

---

Scott E. Eckas, Wachtell, Lipton, Rosen & Katz, New York City, for Kilpatrick, Pino, Cruz, Cohen, Elliot, Majestic Hotel and New York Urban Coalition Housing Group.

Sergio J. Tuero, Asst. Corp. Counsel, Law Dept., New York City, for Quinlan, Maley and 84th Pct of the New York City Police Dept.

Vincent Leong, Asst. Atty. Gen., New York City, for Cohen, Miller and Freidmutter.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Plaintiff *pro se* Henry Platsky brings this civil rights action under 42 U.S.C. §§ 1985(3) and 1986 against Doris Kilpatrick, Maria Pino,[1] Albert Cruz, Gregory Cohen, Donald Elliot, the Majestic Hotel, and the New York Urban Coalition Housing Group (the "Urban Coalition") (collectively, the "Coalition defendants"); against Steven Cohen, Seth Miller, and Cindy Freidmutter (collectively, the "state defendants"); and against Inspector Quinlan, Detective Maley, and the 84th Precinct of the New York Police Department (collectively, the "municipal defendants"). The complaint in this action, first filed on August 25, 1991, alleges that defendants Kilpatrick, Pino, and Cruz violated Section 1985(3) through their attempts "to deprive plaintiff of equal privileges and immunities under the law by conspiring to harass, intimidate, threaten, falsely arrest and evict plaintiff because of his political beliefs." (Complaint ¶ 4) In addition, the complaint alleges that the other Coalition defendants, the state defendants, and the municipal defendants violated Section 1986 by "neglecting to prevent said conspiracy despite having knowledge of the wrongs conspired to be done and being in position where reasonable diligence could have prevented said wrongs." (*Id.* ¶ 5)

All of the defendants now move for summary judgment pursuant to Rule 56. More specifically, the Coalition defendants make four arguments in support of their motion:

---

Henry A. Platsky, pro se.

1. Maria Pino is also listed throughout various court documents as Maria Cruz.

first, that plaintiff has not provided any evidence that the Coalition defendants acted with the requisite class-based animus; second, that the Coalition defendants are not state actors; third, that no conspiracy exists since the Coalition employees are deemed to be the same as the organization to which they belong and thus are a single person; and fourth, that plaintiff is not a member of a stigmatized class since he had no involvement with a socialist organization or association during the time of the alleged discriminatory conduct. The state and municipal defendants also make several arguments in favor of their motion for summary judgment, most notably that since the Section 1985 claim against the Coalition defendants must be dismissed, the derivative Section 1986 claim against the state and municipal defendants must fail as a matter of law. They also argue that plaintiff has failed to meet the legal prerequisites of a Section 1986 action.[2] For the reasons described below, the defendants motions for summary judgment are hereby granted.

## FACTS

At the time of the events that gave rise to this action, plaintiff was a long-time resident of the Majestic Hotel in Brooklyn. (Transcript of Platsky Deposition at page 8 [hereinafter Tr. ___])[3] In 1990, the Urban Coalition, a private, not-for-profit corporation, acquired the hotel for the purpose of making certain units available for mentally handicapped residents.[4] (Affidavit of Gregory Cohen ¶ 6) To help finance its purchase and renovation, the Urban Coalition applied for and received funding from two state agencies: the New York State Division of Housing and Community Renewal Office of Rent Administration ("DHCR") and the New York State Office of Mental Health ("OMH").[5] (*Id.* ¶ 8) Both grants were obtained pursuant to agreements by which the Urban Coalition promised to operate the Majestic Hotel as a permanent rental residence for low income single people; to set aside at least 30 units for occupancy by people with a history of mental illness; and to comply with the laws of the State of New York. (*Id.* Exhs. C & D)

Defendant Gregory Cohen is Vice President of the Urban Coalition and defendant Elliot is the former Chairman of that organization. (*Id.* ¶¶ 1, 12) During the time period covered by plaintiff's complaint, defendants Kilpatrick, Pino, and Cruz were employed by the Urban Coalition in the following capacities: Kilpatrick was a manager of the Majestic hotel; Pino was the assistant manager and maid; and Cruz was a clerk. (*Id.* ¶ 11) Plaintiff alleges that "[u]pon taking over as Manager of the hotel, Ms. Kilpatrick, assisted by [Ms. Pino and her] son Albert began a systematic campaign to harass plaintiff." (Complaint

---

2. This case was the subject of an earlier motion to dismiss before this court. Plaintiff originally named the New York State Division of Housing and Community Renewal Office of Rent Administration and the New York State Office of Mental Health as defendants as well. However, this court granted those organizations' motion to dismiss on the grounds of lack of subject matter jurisdiction; since a state agency is not a "person" within the meaning of Section 1986, it cannot be sued under that statute. *See Seibert v. Oklahoma*, 867 F.2d 591 (10th Cir.1989); *Coffin v. South Carolina Department of Social Services*, 562 F.Supp. 579 (D.S.C.1983). The same order, issued on December 23, 1991, denied the state and Coalition defendants' motions to dismiss for failure to allege a factual basis for claims brought under Sections 1985 and 1986; and denied the Coalition defendants' motion to dismiss on the grounds of claim and issue preclusion.

3. Defendants took Mr. Platsky's deposition on June 17, 1992. Platsky has submitted an errata sheet and, where appropriate, those acknowledged errors are discussed below.

4. Plaintiff's allegation that the New York State Office of Mental Health ("OMH") took over the hotel in June of 1990, (Complaint ¶ 6), is therefore not completely accurate. Although this opinion discusses the Urban Coalition as the hotel owner, the title to the Majestic is held by Coalition Conservation, Inc. ("CCI"), a private nonprofit affiliate of the Urban Coalition. (Cohen Aff. ¶¶ 3–4, 6, 11) CCI does not have its own hotel employees but rather all Majestic Hotel staff members are employees of the Urban Coalition.

5. More specifically, OMH awarded a State Aid Grant in the amount of $881,844 and DHCR awarded $741,420 under the Special Needs Housing Program. (Cohen Aff. ¶ 6)

¶ 6) Among the harassing acts about which plaintiff complains are: repeated fire alarms in the building (Tr. 97–98, 127); disruptive behavior at plaintiff's door by another resident of the hotel allegedly at the Coalition defendants' direction (Tr. 144–48); threats of physical harm by Kilpatrick (Tr. 168–71, 175–76, 223–24); unauthorized entry of plaintiff's room (Tr. 171, 177–78); setting off car alarms beneath his window (Tr. 172–75); threats with a firearm by Cruz (Tr. 206–09); and repeated announcements over the loudspeaker (Tr. 198–99).

Plaintiff states that he "came to learn, through confidential communication on the part of employees of the hotel, that the reason for this campaign of harassment was the socialist politics of the plaintiff." (Complaint ¶ 7) In his deposition, plaintiff acknowledges that this statement is partly erroneous: only a single person ("Cliff") delivered this "confidential communication" (Tr. 113–14, 116); he had no evidence that Cliff was a hotel employee other than seeing him do odd jobs; and Cliff never explicitly mentioned plaintiff's socialist politics (Tr. 109–10, 295–97, 337–38). However, plaintiff points to the following evidence to substantiate his assertion that the Coalition and its employees discriminated against him on the basis of his political beliefs: a table set up in the hotel lobby that had a copy of *Spy* magazine on it (Tr. 118–19); a memorandum from Kilpatrick stating that plaintiff "is the type to 'recruit' support amongst the tenancy" (Tr. 300); [6] a conversation with Kilpatrick where she responded to his complaints by telling him to "go and fight the state" (Tr. 120); the similarity between the harassment he was suffering at the hotel and harassment he experienced in other aspects of his life (Tr. 117); and his intuition. (Tr. 98, 102) Plaintiff provides no direct evidence that Kilpatrick or other hotel employees knew of his socialist beliefs. (Tr. 140, 181–82) In their affidavits, all the Coalition defendants expressly deny knowledge of plaintiff's political beliefs until they received his complaint in this action. (Cohen Aff. ¶ 17; Cruz Aff. ¶ 4; Pino Aff. ¶ 3; Kilpatrick Aff. ¶ 3)

Plaintiff informed both DHCR and the Urban Coalition of the alleged situation at the hotel. (Tr. 127, 143–44, 303–10) Sometime in July of 1990, plaintiff and the hotel managers entered into a mediation agreement in which the former agreed to pay his rent in a timely manner, and the latter agreed to advise plaintiff before entering his room for renovation purposes and to repair the hotel alarm systems. (Tr. 143–44, 160–62, 311–13); Complaint, Exh. 2) Later in July, the DHCR, represented by defendant Seth Miller, also met with plaintiff and heard his complaints. (Tr. 303–10) [7] At no time during these mediation proceedings did plaintiff tell anyone at the DHCR that he believed the motivation for the alleged harassment was his socialist beliefs. (Tr. 163)

Plaintiff alleges that the Coalition defendants continued to harass him and failed to abide by their part of the agreement, leading him to file a second complaint with the DHCR in August of 1990. (Tr. 182) Plaintiff also claims that defendant Miller was not responsive to his complaints or to a subsequent letter dated November 24, 1990 in which plaintiff set forth a long list of harassing incidents that had occurred since the date of the mediation conference. (Complaint, App. 1)

Plaintiff first contacted the OMH in the fall of 1990 by delivering a copy of this letter to defendant Freidmutter. (Tr. 326) Freidmutter, OMH's Director of Housing Development, (Freidmutter Aff. ¶ 1), arranged for a November 30, 1990 meeting among plaintiff, the hotel managers, and an OMH representative. (Complaint ¶ 9; Tr. 329) Plaintiff, however, was arrested on the morning of November 30, 1990 by officers of the defendant 84th Precinct "on a false complaint filed by Albert Cruz...."

---

**6.** The memorandum, written on June 23, 1990, described an encounter between Kilpatrick and Platsky where the latter announced he was withholding rent as a result of the fire alarms. (Tr. 142)

**7.** Although plaintiff names Steven Cohen, another employee of DHCR, as a defendant, he acknowledges that he had no contact with Cohen and therefore moves to drop any complaint against him.

(Complaint ¶¶ 9–10; Tr. 218–220) Plaintiff therefore missed the scheduled meeting; he alleges that Freidmutter refused to schedule a second conference, (Tr. 329–330), although she does not recall speaking with him after the scheduled meeting date. (Freidmutter Aff. ¶¶ 9, 11)

Citing the alleged incidents of harassment discussed above, plaintiff stopped paying his rent in June 1990. (Tr. 137–38) He resumed payments for five weeks following the execution of his mediation agreement with the Urban Coalition but permanently stopped making payments in August of 1990, stating that the harassment did not cease but rather intensified. (Tr. 184) In November of 1990, the Urban Coalition brought an eviction proceeding against plaintiff in housing court because of his failure to pay rent. The parties entered into a stipulated judgment pursuant to which plaintiff agreed to move out of the Majestic Hotel and, in exchange, the Urban Coalition released him from any obligation to pay back rent. (Tr. 241–42, 245–46) Plaintiff left the hotel in January, 1991. (Tr. 333)

## DISCUSSION

Summary judgment is appropriate when the moving party establishes that there exist no issues of material fact that bar the court from granting judgment as a matter of law. Fed.R.Civ.P. 56. Once the moving party has carried its burden under Rule 56, the nonmoving party must "come forward with 'specific facts showing that there is a *genuine issue for trial.*' ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Therefore, summary judgment may be granted if "the evidence is merely colorable, ... or is not significantly probative." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Bearing these principles in mind, this court turns to the facts at issue in this action.

## I. Section 1985

Section 1985(3) of Title 42 of the United States Code provides, in relevant part:

If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

Defendants challenge four aspects of plaintiff's 1985 claim. Since their arguments relating to plaintiff's allegations of class-based animus, this court does not address the state action and conspiracy arguments in detail.

Defendants correctly state that an element of an action under Section 1985(3) is a "class-based animus" directed against plaintiff as a member of that class:

The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action.

*Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971); *see also Silkwood v. Kerr–McGee Corp.*, 637 F.2d 743, 748 (10th Cir.1980), *cert. denied*, 454 U.S. 833, 102 S.Ct. 132, 70 L.Ed.2d 111 (1981) ("To state a cause of action under section 1985(3) the law requires prejudice against a class qua class."). From this observation, defendants make two separate arguments: first, that plaintiff has failed to prove that any of the incidents of harassment occurred as a result of his socialist political beliefs; and second, that even if plaintiff was harassed as a result of his socialist views, political beliefs do not make plaintiff a member of a stigmatized class.

As to defendants' second argument, the Second Circuit has held that a *political* animus—rather than a racial animus—satisfies the class-based animus requirement

of Section 1985(3). *See Keating v. Carey*, 706 F.2d 377, 386–88 (2d Cir.1983) (because Section 1985(3) "prohibit[s] political discrimination in general," Republicans are protected class under statute). However, it is not clear that individual political *beliefs* alone satisfy the requirements of a political class. *See Gleason v. McBride*, 869 F.2d 688, 694–95 (2d Cir.1989). In *Gleason*, plaintiff—a political Independent—claimed that defendants discriminated against him because he expressed vocal opposition to their political views. *Id.* at 695. The Second Circuit held that the plaintiff's political and philosophical views and opposition to governmental attitudes did not make him a member of a cognizable class under Section 1985. *Id.; see also Mahoney v. NOW*, 681 F.Supp. 129, 135 (D.Conn.1987) (holding that "pro-life, anti-abortion political affiliation" not cognizable class since "it refers to an unidentifiable number of otherwise unassociated persons who hold a certain viewpoint on one specific issue").

This case differs from *Gleason*, however, for as plaintiff argues he is claiming membership in a group—"the political left"—that has been the subject of historical discrimination. At the time of the alleged harassment, plaintiff's membership was limited to Anthroposophy—a spiritual, philosophical organization that takes a general interest in politics but does not involve itself in political campaigns; however, he is an avowed socialist who has belonged to numerous socialist organizations in the past. Therefore, he, unlike the *Gleason* plaintiff, is claiming discrimination not as an individual who has dissident beliefs but rather as part of a group of people who hold the same general political beliefs. *Cf. id.* at 695 ("It is worth noting that the complaint does not disclose who besides Gleason may belong to this purported class."). Insofar as plaintiff has belonged to recognized socialist organizations and is a "Socialist," he fits more squarely within *Keating* than did the *Gleason* plaintiff; however, to make this observation is not to resolve the issue at hand.

Even if this court were to find that plaintiff is a member of a protected class, it is not clear that *Keating* remains good law in light of *United Brotherhood of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983). In *Scott* the Supreme Court suggested that Section 1985 might not extend to discrimination against political groups except where racial animus was involved. *Id.* at 836, 103 S.Ct. at 3360. Several circuits have reasoned that this language in essence overturns *Keating*. *See, e.g., Harrison v. KVAT Food Management, Inc.*, 766 F.2d 155, 161–62 (4th Cir.1985) (declining to follow *Keating* in light of *Scott*); *Grimes v. Smith*, 776 F.2d 1359, 1366 (7th Cir.1985) (same). The Second Circuit has not yet expressed a view on this issue. *Compare Gleason*, 869 F.2d at 695 (explicitly refusing to decide viability of *Keating*) with *New York State NOW v. Terry*, 886 F.2d 1339, 1358 (2d Cir.1989) (citing *Keating* to conclude that women constitute protected class under Section 1985).

Finally, though, this court need not decide the viability of *Keating;* even if political beliefs *did* make plaintiff a member of a protected class, consideration of the undisputed facts in this case reveals that plaintiff has failed to establish the requisite link between his class association and defendants' actions that is the essence of a Section 1985 action. Plaintiff admits that none of the Coalition defendants—Kilpatrick, Pino, and Cruz—ever directly denigrated or even acknowledged his political beliefs. (Tr. 139–40, 142, 181–82) In fact, he recognizes that many of the actions from which he suffered—such as fire alarms and heating problems—were felt by the entire building. Furthermore, he acknowledges that Pino and Cruz acted out of obedience to Kilpatrick and not from any animus towards socialism. (Tr. 210–16) And finally he extracts Kilpatrick's political motivation only from the occurrences described above: the "confidential communication" by Cliff; the pattern of harassment; *Spy* magazine; Kilpatrick's statements. However, none of this evidence to which plaintiff points contains any reference to his socialist politics; it certainly does not establish that defendants' actions

resulted from views about plaintiff's politics. Examples are instructive.

Plaintiff explained that the confidential communication proceeded as follows:

A: He communicated to me and it was clear he was doing so in such a way that he didn't want to be overheard, he told me to look outside, and if you know the way out of the Majestic Hotel the phone booth [where I was sitting] has a direct view to the door right outside into the street. And I did so. And there were several men standing in a group and they suddenly realized that I was looking at them and they sort of became nervous all of a sudden and sort of backed away so I couldn't see them. They were no longer in my view.

And he let it be known to me that these people had been all over the hotel talking to people and that this was the sort of thing that was going on, and then he walked away.

\* \* \* \* \* \*

Q: Did you discuss socialism with this person?

A: No.

Q: Did he say that you were being harassed because you were a socialist?

A: He didn't use those words.

Q: Did he say the word socialism in the conversation?

A: The word socialism did not come up. (Tr. 106–09)[8] A trier of fact could not find this conversation to support plaintiff's conclusion that the Coalition defendants were acting on the basis of his political beliefs. Similarly, the copy of *Spy* magazine, Kilpatrick's statement that plaintiff was the type to recruit support amongst his co-

tenants, and her statement that he should "fight the state" on their face do not indicate any politically-motivated bias.

Although plaintiff responds eloquently and imaginatively to the argument that defendants were not motivated by a class-based animus, his claims substantiate the conclusion that any actions taken by hotel employees against him resulted from their distaste for him as an individual and not as a class member. In his affidavit plaintiff states:

If Ms. Kilpatrick was not motivated by any animus towards me, why did she feel compelled to accuse me of the most absurd offenses ... [A]ccepting, for the sake of argument, that Ms. Kilpatrick's accusations were true, that would certainly make me a vandal and a troublemaker, certainly a most undesirable person for a resident. But how would that necessarily make me an organizer? A "type" to organize amongst the tenancy? ... Ms. Kilpatrick's memos clearly show her extreme bias and they clearly show that she thought of me as an organizer "type", i.e., a political person of the Left.

As plaintiff recognizes (Tr. 113), merely sharing a characteristic with members of a group—such as a tendency to stir up trouble—does not mean that one who expresses dislike for that particular quality acts from class-based hatred; this assertion is especially true when the trait is common to so many individuals and groups. Reference to other memoranda written by Kilpatrick, including one she had written a day before that excerpted above, helps clarify her statements as based on a personal dislike for the plaintiff.[9] Finally, as plaintiff him-

---

**8.** The exchange continues:

Q: Did you have any reason to believe that the informant knew you were a socialist?
A: Yes.
Q: Why? What was that reason?
A: Cause it was generally known in the hotel.
Q: Had you ever discussed it with him?
A: Not with him personally.
Q: How do you think he learned you were a socialist?
A: Well, from [the former owners], that would be the easiest way, and also the fact

that these people were all around the hotel, and he knew of that fact.
Q: Did he tell you that he had spoken to these men?
A: No, he did not tell me that.
Q: And you had never spoken to him about your socialist activities before?
A: Not directly. No.

**9.** For example, "If Mr. Platsky is allowed to remain here without paying rent, he is the type to inform other tenants and encourage them to do the same." (Memorandum from Kilpatrick to Matin, June 22, 1990, Plaintiff's Brief in Op-

self acknowledged, the statement "go and fight the state" could just as easily refer to New York state—in the guise of the OMH or DHCR—as the capitalistic state. (Tr. 120)

Viewing all of the evidence as a whole, this court finds that plaintiff has not raised any material question of fact as to whether defendants were motivated by his politics. Assuming all of plaintiff's allegations of harassment are true, it is clear that any words and actions leveled directly at him by defendants stemmed from his behavior as an individual and not as a socialist. *See Gleason*, 869 F.2d at 695 ("As did the district court, we agree with that portion of Justice Blackmun's dissent in *Scott* which stated that under section 1985 'the intended victims [of discrimination] must be victims not because of any personal malice the conspirators have toward them, but because of their membership in or affiliation with a particular class.'") (*quoting Scott*, 463 U.S. at 850, 103 S.Ct. at 3367) (Blackmun, J., dissenting). Since plaintiff must prove class-based animus in order to maintain a Section 1985 action, defendants are entitled to summary judgment. Accordingly, all claims based on Section 1985 should be dismissed.

■ Defendants make two additional arguments regarding Section 1985 liability: that the Urban Coalition is not a state actor and that plaintiff cannot show a conspiracy. As the absence of class-based animus is dispositive, this court will deal with the remaining arguments in summary fashion. Since Section 1985 is purely remedial and "'provides no substantial rights itself,'" *Scott*, 463 U.S. at 833, 103 S.Ct. at 3358 (*quoting Great America Federal Savings & Loan Ass'n v. Novotny*, 442 U.S. 366, 372, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957 (1979)), the "rights privileges and immunities that § 1985(3) vindicates must be found elsewhere." *Id.* In this case, plaintiff claims he was denied of equal protection under the fourteenth amendment. Although Section 1985 can reach some private conspiracies, *Griffin v. Breckenridge*, 403 U.S. 88, 101, 91 S.Ct. 1790, 1797, 29 L.Ed.2d 338 (1971), the substantive right upon which this claim is based *does* have a state action requirement. *See United States v. Guest*, 383 U.S. 745, 755, 86 S.Ct. 1170, 1176, 16 L.Ed.2d 239 (1966) (holding that rights under equal protection clause arise only when actor is state or conduct is under color of state law). *Compare Emanuel v. Barry*, 724 F.Supp. 1096, 1102 (E.D.N.Y.1989) (holding if no state action, Section 1985(3) claim can be maintained only if plaintiff alleges deprivation of private right, such as under thirteenth amendment).

■ To satisfy this requirement, plaintiff alleges that the Urban Coalition—a not-for-profit corporation—is a state actor; he points to the Coalition's receipt of funds from state agencies and its use of those funds pursuant to various written agreements. However, the Supreme Court case law on this issue indicates, fairly clearly, that these ties to New York State are insufficient to constitute state action. *See, e.g., Rendell–Baker v. Kohn*, 457 U.S. 830, 843, 102 S.Ct. 2764, 2772, 73 L.Ed.2d 418 (1982) (holding no state action by private school deriving 90% of its funding from public sources and subject to extensive public regulation); *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (finding extensively regulated, publicly funded nursing homes not state actors, explaining that "'[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment.' ... The complaining party must also show that 'there is a sufficiently close nexus between the State and the challenged action of the regulated enti-

position to Motion for Summary Judgment, Exh. 3) The same memorandum states: "Mr. Platsky feeds and gives water to all the mice that he can find in this building. He says they are living things and more importantly, they are his friends." (Memorandum from Kilpatrick to Matin, June 22, 1990, Plaintiff's Brief in Opposi-

tion to Motion for Summary Judgment; Exh. 3) However, plaintiff's arguments to the contrary, this court does not find that the resemblance between plaintiff's philosophy and Kilpatrick's statement about mice demonstrates animus based on plaintiff's political views.

ty so that the action of the latter may be fairly treated as that of the State itself.'") (*quoting Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350–351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974).

 Defendants also argue that plaintiff has not proven a conspiracy since all the co-conspirators are employees of the same organization. The Second Circuit has held that a conspiracy among two or more employees of a corporation acting in the normal course of their employment does not constitute a conspiracy "between two or more persons" for the purposes of § 1985(3). *Girard v. 94th Street and Fifth Avenue Corp.*, 530 F.2d 66, 71 (2d Cir.), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976). An employee's scope of employment is quite broad and encompasses all actions that are "actuated, at least in part, by a purpose to serve the master." W. Page Keeton *et. al Prosser & Keeton on the Law of Torts* § 70, at 502 (5th ed. 1984).[10] Since all the co-conspirators charged with violating Section 1985 are employees of the Urban Coalition, plaintiff has failed to satisfy yet another of that statute's requirements.[11]

## II. Section 1986

42 U.S.C. § 1986 claim provides, in relevant part:

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act be committed, shall be liable to the party injured ... for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented....

Since liability under Section 1986 derives wholly from Section 1985, in order to impose liability under the former a court first must find liability under the latter. *Dacey*

*v. Dorsey*, 568 F.2d 275, 277 (2d Cir.), *cert. denied*, 436 U.S. 906, 98 S.Ct. 2238, 56 L.Ed.2d 405 (1978) ("Having failed to state a cause of action under § 1985, plaintiff has failed to state a claim under § 1986"). Accordingly, since defendants are entitled to summary judgment on plaintiff's Section 1985 claim, summary judgment is appropriate on the 1986 claim as well.

SO ORDERED.

---

10. In addition, as defendants point out, if plaintiff denies that the individual employees are acting on behalf of the Urban Coalition, his state action argument is wholly defeated.

11. Plaintiff in his response brief alleges that the police conspired to violate his rights; however, he provides no facts (nor does he even allege) that they knew of his political beliefs.